UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

RUDOLPH WASHINGTON                    CIVIL ACTION NO. 3:13-cv-0217
        LA. DOC #308049
                                      SECTION P
VS.
                                      JUDGE ROBERT G. JAMES
MAJOR TUBBS AND
LT. COLEMAN                           MAGISTRATE JUDGE HAYES

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a

Motion for Summary Judgment and Partial Summary Judgment, [doc. # 78], filed by Defendants

Major Tubbs and Lt. Coleman.  Plaintiff opposes the Motion.  For reasons assigned below, it is

recommended that the Motion be **GRANTED**.

Background

On January 24, 2013, Plaintiff Rudolph Washington, an inmate at the Bossier Medium

Security Facility, filed the instant *pro se* civil rights complaint under 42 U.S.C. § 1983.  [doc. #

1].  Plaintiff alleges that on August 29, 2012, while he was incarcerated at the Richwood

Correctional Center (RCC), he was the victim of excessive force at the hands of the two named

Defendants, Major Tubbs and Lt. Coleman.  *Id.* at 3.  Specifically, he alleges that Lt. Coleman

handcuffed him and Major Tubbs then damaged his eyes by spraying him with pepper spray.  *Id.*

Plaintiff also alleges that Defendants denied him medical attention for his damaged eyes

from August 29, 2012, through September 5, 2012.  *Id.*  After being sprayed, Plaintiff states that

the attending nurse attempted to rinse the spray from his eyes but, in so doing, damaged his eyes

further because the rinse ran into his eyes instead of away from his eyes.  [doc. # 14].  The nurse,

according to Plaintiff, eventually stopped rinsing because Plaintiff refused to open his eyes.  *Id.*

Plaintiff further alleges that, on August 30, 2012, he asked a Sergeant Kerrey to "go to medical" to receive further treatment for his eyes, but Sergeant Kerrey refused.  *Id.* at 2.  On August 31, 2012, Plaintiff avers that Sergeant Kerrey escorted Plaintiff to the nurse station because Plaintiff's eyes were bleeding.  *Id.*  There, the nurse allegedly informed Plaintiff that he "was not bleeding enough from the eyes."  *Id.*  On September 3, 2012, Plaintiff states that he again asked the head nurse and assistant head nurse to treat his eyes, but they refused.  *Id.*

Finally, Plaintiff alleges that Defendants refused to return his personal property to him after they transferred him from RCC to the Jackson Parish Correctional Center ("JPCC") on September 5, 2012.  *Id.* at 4.  Plaintiff prays only for punitive damages.[1]  [doc. # 1, p. 4].

On March 17, 2013, Defendants filed the instant Motion for Summary Judgment and Partial Summary Judgment.  [doc. # 78].  Defendants argue that all three of Plaintiff's claims against Lt. Coleman should be dismissed but only two of Plaintiff's three claims against Major Tubbs should be dismissed.  Specifically, Defendants contend that there is no genuine dispute as to any material fact with respect to Plaintiff's claims against them for failure to provide adequate medical care and for loss of property.  [doc. # 76-3].  Defendant Coleman contends that there is no genuine dispute of material fact with respect to Plaintiff's excessive force claim against him.  *Id.* at 11.  Defendants concede that Plaintiff's excessive force claim against Major Tubbs remains an issue for trial.  *Id.*

The matter is now before the Court.

## Law and Analysis

---

[1] Plaintiff's Complaint states that he seeks "Purative Damage."  The Court construes Plaintiff's request as one for punitive damages.

2

Summary judgment is appropriate if the evidence before a court shows "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden."  *Beck v. Tex. St. Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim."  *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial.  *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000).

Substantive law determines what facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The facts are reviewed drawing all reasonable inferences in favor of the non-moving party.  *PYCA Indus., Inc. v. Harrison Cnty. Waste Water Mgmt. Dist.*, 177 F.3d 351, 361 (5th Cir. 1999).  However, this is only so when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  In the absence of proof, a court does not "assume that the nonmoving party could or

3

would prove the necessary facts." *Id.*

## I. Failure to Provide Medical Care

Plaintiff claims that Defendants failed to provide appropriate medical care on two separate occasions: once immediately after Major Tubbs sprayed Plaintiff with pepper spray and then again throughout the week following the incident.  [doc. # 1, p. 3].  Defendants argue, in contrast, that Plaintiff received adequate care immediately following the incident and, with regard to the days following the incident, that they were not aware that Plaintiff was at risk of any harm.  [doc. # 78-3, p. 9-10].

A convicted inmate's claim for inadequate medical care is analyzed under the Eighth Amendment's prohibition against cruel and unusual punishment.  To establish liability, an inmate must adduce facts which "clearly evince" a serious medical need and the prison official's deliberate indifference to it.  *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This standard requires a plaintiff to show that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (citation and quotation marks omitted).

A prison official cannot be held liable unless: "(1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official actually drew that inference; and (3) the official's response indicates that the official subjectively intended that harm occur."  *Thompson v. Upshur Cnty., TX.,* 245 F.3d 447, 458-59 (5th Cir. 2001).  "[T]he failure to alleviate a significant risk that [the official] should have perceived, but

4

did not is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756.  Consequently, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459.  The Fifth Circuit has stated that "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment,'" and does not amount to deliberate indifference. *Domino*, 239 F.3d 756 (citing *Estell*e, 428 U.S. at 107).  Ultimately, "[d]eliberate indifference is an extremely high standard to meet." *Id.*

Here, Defendants present the following colloquy that took place between defense counsel and Plaintiff at Plaintiff's deposition with respect to the care Plaintiff received immediately after Major Tubbs sprayed Plaintiff with pepper spray:

> A. [Lt. Coleman] brought me to the nurse station.  The nurse tells me to hold my head back to rinse out the chemical agent.  I tilted my head back.  She pours the chemical agent in it.
>
> Q. I'm sorry?  She pours what in it?
>
> A. The rinse or whatever they wanted--
>
> Q. There's like an eye wash--
>
> A. Eye wash.
>
> Q. --that they sometimes use.  It's an agent to neutralize the chemical agent.  Is that what you were understanding they were doing for you?
>
> A. Yes.  When she told me to hold me back and she was going to rinse it out, you know, get the chemicals from the eyes, I tilted my head back.  She pours the chemical and it goes into my eyes and causes it to burn even more so.
>
> Q. Okay.
>
> A. And I--She done it once or twice, and I said, "No, no, no, no.  Stop, stop, stop, stop, because you ain't doing nothing but like spreading."  You know, it's like if you put gas with water, try to put gas out with water out with gas and carrying on.  What

you going to do?  You're going to spread the fire.  You know, there's no need. You're going to need dirt.  So that's what I believe she was doing.  When she poured it in, she spread the chemical even worser, made it even worse by telling me to tilt my head back, and the chemical is going into my eyes.

Q. Okay. If you look at page 31, there's a report that says the nurse–and I'm paraphrasing–nurse attempted to irrigate the eyes with eye wash.

A. Right. The eye wash.

Q. So that's consistent with what you just described?

A. Yes, sir.

Q. And then "Offender not wanting to open eyes."  Is that a true statement?

A. Yes.

Q. And that's because of the burning sensation?

A. Right.

* * *

Q. Did you walk to the shower area?

A. Yes.

Q. What happened there?

A. I showered off to get the chemicals off of me, the pepper spray, water it down.

Q. Water?

A. Yeah. And took a shower from the pepper spray.

* * *

Q. And so did they give you a clean set of jumpers when you came out of the shower?

A. Yes.

Q. And so you would have gotten rid of all the contamination you could have washed

6

off?

A. Right.

Q. And then whatever contamination would have been on the clothing would not be affecting you?

A. Right.

[doc. # 78-7, p. 13-14].  Plaintiff presents no evidence that contradicts any of his deposition testimony.

Plaintiff's testimony establishes that Defendants were not deliberately indifferent to his medical needs.  Defendants did not refuse to treat him, did not ignore any of his complaints, did not intentionally treat him incorrectly, and did not engage in any similar conduct that clearly evinced a wanton disregard for Plaintiff's serious medical needs.  Even assuming Plaintiff was exposed to a substantial risk of serious harm (i.e. risk of eye damage due to the pepper spray), Plaintiff fails to come forth with any competent summary judgment evidence showing that Defendants actively disregarded that risk of harm.

In fact, in *Martin v. Seal*, 510 Fed. App'x 309, 315 (5th Cir. 2013), the Fifth Circuit found that treatment similar to that given to Plaintiff, and under circumstances analogous to those here, was entirely adequate.  There, the court held that an inmate failed to establish that employees of a prison were deliberately indifferent when the employees, after spraying the plaintiff with chemical spray, examined the plaintiff, determined that he was not injured, and offered him a shower.  *Id.*  The court stated, "[s]uch actions counter [plaintiff's] allegations of deliberate indifference."  *Id.*; *accord, Hudson v. Gusman*, 2014 WL 906155, at *6 (E.D. La. March 7, 2014) (finding that treatment given forty-eight hours after being sprayed with pepper spray was constitutionally adequate); *Pea v. Cain*, 2014 WL 268696, at *7 (M.D. La. Jan. 23, 2014) (noting

that even if prison officials denied the inmate plaintiff a shower after being sprayed with irritant, the plaintiff's claim did not rise to one of constitutional dimension); *Carter v. Hayes*, 2013 WL 1871643, at *4 (S.D. Miss May 3, 2013) (finding no deliberate indifference where prison officials gave an inmate milk to wash out mace and then allowed the inmate to shower).

Plaintiff's allegations, at best, approximate a negligence claim.  For instance, Plaintiff appears to argue that the treating nurse was negligent because she poured the rinsing solution into his eyes at an improper angle.  In that respect, "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).  Even if Plaintiff's allegations against the nurse did constitute deliberate indifference, the Court observes that Plaintiff did not name the nurse as a defendant.  The named Defendants, Major Tubbs and Lt. Coleman, were not involved in Plaintiff's treatment; rather, the named Defendants escorted Plaintiff to the medical facility before treatment and then, after treatment, escorted Plaintiff to the shower and gave him a clean "set of jumpers."  The named Defendants' actions fall far short of wanton disregard of Plaintiff's needs and thus do not constitute deliberate indifference.

The record similarly lacks any probative evidence from which the Court can conclude that Defendants acted with deliberate indifference to Plaintiff's medical needs in the days following the spraying.  Defendants present the following colloquy that took place between Plaintiff and defense counsel at Plaintiff's deposition with respect to the care Plaintiff received in the days following the incident:

Q. Well, tell me about your eye messing up.

A. The chemical burn from the 29th, I got sprayed and I washed it out, and that following day, August the 30th, 2012, it blowed up.  It swole up on me and my eye was puffy.  It was red.  It was irritated.  I knocked on the door, tried to get in contact with the sergeant, the officer outside.  And the officer came.  Sergeant Kelly–Kerry was the officer.  He told me–he refused me, telling me I'm going to be all right.  August the 31st--

Q. All right. Let's stop for a second.  Did you fill out a medical request form?

A. No. They refused to give me a medical–They refused to give me any kind of form-

Q. When you say, "They," was it Major Tubbs?

A. When I say, "They," I mean any officer that knew me.

Q. Okay.  Let's stop for a second.  Did you ever show Major Tubbs on August 31st your eye?

A. Major Tubbs never came to the– But Captain Foreman saw my eye.

Q. All right.  But let's talk about Tubbs.  Tubbs never saw your eye?

A. No.

Q. That's a correct statement?

A. Oh, I can't–I can't say that he did and can't say that he didn't.

Q. Well, he wasn't one of the persons that you said, "Here's my eye.  I need medical treatment"?

A. Well, no.  At that time I was in lockdown.  It was hall–hall B.  Tubbs' office is on the left side with the captains' and the lieutenants' office, and mine's is–well, segregation lockdown is at the other end of the hall on the right side.

Q. So he had the opportunity to check on you; you just don't know if he did?

A. He–Think he knew what he did, because I believe they talks around there.

Q. Well, there's a difference between what you saw versus what you think.

A. Okay.

9

Q. All right.  The way you've described it, the segregation cells are down a hall, but someone can come down the hall and look in if he chooses to.  Correct?

A. Correct.

Q. And Tubbs would have had the opportunity, had he chosen to do so, to come check?

A. Right.

Q. You just don't know if he did or not.  Correct?

A. Correct.

Q. Okay. You suspect, because he's the major, that he would know, that someone would have reported it to him?

A. Right.

Q. Okay.  Now, let's talk about Lieutenant Coleman.  Lieutenant Coleman also had the ability to come check on you?

A. Right.

Q. He could have come down the hall and looked in the port or the window. Correct?

A. Right.

Q. Or he could have asked somebody else what's going on?

A. Right.

Q. You just don't know if he did or not.  Correct?

A. Lieutenant Coleman did take a look in there, I remember him taking a peek in there one time.

Q. Okay.  And when he looked in there--

A. I probably was sitting on the floor or something, like upset behind the whole incident.

Q. All right.  Was your eye swollen at that time?

10

A. Yes.

Q. Do you know whether he could have seen that from where he might have been looking?

A. I can't say that he did.

Q. Okay.  Was it any more swollen that you might get if you got punched in the eye?

* * *

A. Right.  It was puffy.  It was red.  It was–it was like--

Q. All right.  And how long was it puffy or red?

A. For about two weeks.

[doc. # 78-7, p. 17-18].

Plaintiff's deposition testimony demonstrates that Defendants were not deliberately indifferent because they did not have the requisite *mens rea*; in other words, his testimony shows that Defendants were not actually aware of any facts from which they could infer that Plaintiff was at risk of substantial harm.  Plaintiff did testify that Sergeant Kelley knew about Plaintiff's eyes, but Sergeant Kelley is not a named defendant.[2]  As to named Defendant Tubbs, Plaintiff testified that he "can't say" whether Tubbs knew about his damaged eyes because he did not know whether Tubbs checked on him in his cell.  While Plaintiff did testify that Defendant Coleman checked on him in his cell, he also testified that he "can't say" that Coleman could have seen his damaged eyes from Coleman's viewpoint.

Plaintiff's testimony amounts to no more than speculation and unsubstantiated assertion;

---

[2] Plaintiff also alleges that a nurse knew about his condition yet informed him that "he was not bleeding enough from the eyes."  [doc. # 14, p. 2].  However, the nurse is not a named defendant.

11

such testimony "does not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002). Moreover, even supposing that Defendants knew about Plaintiff's damaged eyes and decided not to treat Plaintiff further, the Court reiterates that "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino*, *supra*.

The undisputed facts do not demonstrate that Defendants were deliberately indifferent to Plaintiff's serious medical needs. At most, Plaintiff's testimony indicates that Defendants failed to act reasonably or, stated differently, that Defendants should have perceived a risk of harm but did not. This testimony is insufficient to support an inference of deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Plaintiff has failed to present evidence that would satisfy the stringent standard for showing deliberate indifference; accordingly, Defendants' Motion, with respect to Plaintiff's claim that he received inadequate medical care, should be **GRANTED**.

## II. Excessive Force

Lt. Coleman seeks summary judgment concerning Plaintiff's excessive force claim against him.[3] Initially, the Court notes that it is unclear whether Plaintiff has actually stated a claim against Lt. Coleman for excessive force. There is no conspicuous claim for excessive force, but Plaintiff does somewhat suggest that Lt. Coleman used excessive force when he handcuffed Plaintiff. [doc. # 1, p. 3]. Nevertheless, Plaintiff, in his subsequent deposition

---

[3] Defendant Tubbs does not seek summary judgment with respect to Plaintiff's claim of excessive force.

testimony, testified only that he was "handcuffed from the back" and makes no mention of any improper or excessive use of force when he recounted the alleged event.

When a prison official is accused of using excessive physical force in contravention of the Eighth Amendment's Cruel and Unusual Punishment Clause, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*,  503 U.S. 1, 6-7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312 (1986)); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997).  However, not every malevolent touch by a prison guard gives rise to a federal cause of action.  *Id.* (citation omitted).  The Eighth Amendment does not protect against "*de minimis*" use of physical force, so long as the use of force is not of a sort "repugnant to the conscience of mankind."  *Id.*  (citation and internal quotation marks omitted).  Similarly, a violation of the Eight Amendment requires that the injury incurred be more than *de minimis*.  *Jackson v. Kelly*, 512 F.3d App'x 386, 388 (5th Cir. 2013).   Courts consider the following factors in making a determination: "(1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response."  *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999) (citing *Hudson*, 962 F.2d at 523).

Plaintiff testified to the following at his deposition with respect to his ostensible excessive force claim against Lt. Coleman:

> Q. All right.  Let's talk a little about the day of the incident, because we have this next page, the medical write-up, after the incident.  Okay?  Tell me what happened on the day of the incident leading up to and including the time where you're taken to the nurse.
>
> A. I was coming from the chow hall.

* * *

A. Me and Officer Lumpbus–

* * *

A. Oh, we was just having a dispute or, you know, walking on this here side the hall or get up in line, you know, get against the wall, walking the gray type of thing, you know.  I don't know if they have it outside this door here, but it's–When you go down a hall, they got a white and then they got gray against the wall.  Inmates are supposed to walk–or offenders supposed to walk along the gray instead of in the middle of the hall.

* * *

Q. Okay.  And so Coleman came up.  Now, was Lieutenant Coleman the shift lieutenant?

A. Yes.

Q. And what happened when Coleman arrived?

A. Coleman arrived.  He gave me a couple of orders to go into my room, my assigned unit, which is unit 2.  I went into the unit 2.  I blew gas and he got upset behind it because I blew it out loud and the–the dorm bust out laughing at them and carrying on.  And they got upset, and he called me back out.  When he called me back out, he out, went in hall A to enter the B, and told me to go into the laundry room to change clothes, jumper.  I changed from a beige to a black and white.

Q. And what does that mean?

A. I'm going to the hole.

Q. And the hole is administrative segregation?

A. Yeah, it's lockdown.

* * *

A. So [Lt. Coleman] wrote me up on a No. 3, and dressed me in black and white, brought me out, and handcuffed me afterwards.

* * *

14

Q. Was that a normal operation if you're going to be moved to admin seg?

A. Yes.

* * *

Q. All right. So what happened next?

A. Major Tubbs–After I was handcuffed from the back and dressed in black and white, Major Tubbs comes down a minute later and shouting, calling me smart a**, "What's your problem?" Blah, blah. And I say, "I have no problems, sir." And he said, "Did I tell you to say anything?"  I said, "No."  So he–And then went calling me smart a** more.  And--

Q. What happened next?

A. I saw him reaching for the can, because Major Tubbs has got a habit of spraying people.

* * *

Q. All right.  Now, you had been–Your uniform had been changed.  Your jumper had been changed.  You'd been handcuffed, and you were moving towards admin seg when Major Tubbs got involved?

A. Yes.  Well, me, and Lieutenant Coleman was standing on my right side, and Major Tubbs, he was coming down the hall on the left side of me and calling me smart a**.  As he called me smart a**, he reached for his personal canteen of spray and sprayed me on the left side to the right side of my eyes.

* * *

Q. All right. What happened next?

A. Lieutenant Coleman, he brings me to medical.

[doc. # 78-7, p. 11-13].

Plaintiff's testimony establishes that Defendant Coleman was not the individual responsible for spraying Plaintiff in the eyes.  Rather, Coleman was only involved in handcuffing Plaintiff and Plaintiff does not allege that he suffered even a *de minimis* injury as a result of

15

being handcuffed.  Because he suffered no injury, the handcuffing was only a *de minimis* use of

force and was not repugnant to the conscience of mankind.  *See Jackson v. Culbertson*, 984 F.2d

699, 700 (5th Cir. 1993) ("Because [plaintiff] suffered no injury, we find that the spraying of

[plaintiff] with the fire extinguisher was a *de minimis* use of physical force and was not

repugnant to the conscience of mankind."); *see also Gomez v. Chandler*, 163 F.3d 921, 923 (5th

Cir. 1999) (stating that "some physical injury is an indispensable element of an Eighth

Amendment excessive force claim.").  In addition, Plaintiff does not proffer any evidence that

would support a finding that Coleman possessed the requisite *mens rea*; there is no evidence

indicating that Coleman acted maliciously and sadistically in handcuffing Plaintiff.

  With that said, Plaintiff's response to the instant Motion argues that Coleman "is just as

much [at] fault as Major Tubbs [] for macing [Plaintiff]" because "Coleman fail[ed] to protect

[Plaintiff] from harm."  [doc. # 81, p. 5].  Plaintiff's response also argues that Coleman was an

"accessory" to Defendant Tubbs' actions.  *Id.* at 6.

  As to the former argument, "[t]he failure to protect an inmate from the use of excessive

force by others can give rise to liability under § 1983."  *Moss v. Brown*, 409 Fed. App'x 732, 733

(5th Cir. 2010).  A critical inquiry in determining this so-called bystander liability is "whether [a

defendant] had a reasonable opportunity to realize the excessive nature of the force and to

intervene to stop it."  *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).[4]  Here, there is nothing

---

[4] To be sure, the *Hale* court invoked this language in the context of a Fourth Amendment "bystander liability" claim, rather than in the context of an Eight Amendment claim.  However, the Fifth Circuit, in *Davis v. Cannon*, 91 Fed. App'x 327, 329 (5th Cir. 2004), applied *Hale's* Fourth Amendment analysis to a prisoner's Eight Amendment claim alleging that certain prison officials failed to intervene and protect the prisoner from being sprayed with a chemical agent by another prison official.  *See also Garza v. U.S. Marshals Service*, 2008 WL 501292, at *3 (S.D. Tex. Feb. 21, 2008).  The rule announced *Hale* is applicable here.

in the record establishing that Coleman could have prevented the incident or, more importantly, that Coleman even knew of Major Tubbs' intention to spray Plaintiff.

Plaintiff's latter argument essentially claims that Coleman participated in Major Tubbs' excessive force because he witnessed Tubbs' conduct and did not act to prevent it.  In a sense, Plaintiff argues that by virtue of not acting, Coleman encouraged Tubbs to spray Plaintiff. However, to state a cognizable constitutional violation, a plaintiff must allege facts that demonstrate that an official was personally involved in the alleged constitutional deprivation. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).  Plaintiff does not suggest that Coleman participated in the use of force; rather, he offers only a conclusory assertion that Coleman was "an accessory" to Tubbs' use of force.  As Coleman's actions do not constitute personal involvement, Plaintiff fails to state a cognizable constitutional violation.

In sum, to the extent that Plaintiff's Complaint can be read as asserting a claim of excessive force against Lt. Coleman, Plaintiff fails to point to evidence that would enable a reasonable trier of fact to find that Coleman used excessive force either directly or indirectly. Accordingly, Defendants' Motion, with respect to Plaintiff's excessive force claim against Defendant Coleman, should be **GRANTED**.

**III. Loss of Property**

Plaintiff claims that Defendants are responsible for losing or misplacing his property when he was in the process of transferring from RCC to JPCC on September 5, 2012.  [doc. # 1]. However, Plaintiff's claim is foreclosed by application of the *Parratt-Hudson* doctrine.  This doctrine states that no constitutional claim can be asserted by a plaintiff deprived of his property by negligent or intentional conduct of public officials unless state law fails to afford an adequate

17

post-deprivation remedy for the officials' conduct.  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984);

*Parratt v. Taylor*, 451 U.S. 527, 543 (1981), overruled on other grounds, *Daniels v. Williams*,

474 U.S. 327 (1986).  In Louisiana, when an inmate's property is taken without compensation,

his remedy (conversion) is in state court, not federal court.  *See Marshall v. Norwood*, 741 F.2d

761, 763-64 (5th Cir. 1984); LA. CIV. CODE ANN. art. 2315.  Plaintiff has not shown that this

state law remedy is inadequate.  Accordingly, Defendants' Motion, with respect to Plaintiff's

loss of property claim, should be **GRANTED**.[5]

## IV. Qualified Immunity

Defendants invoke the affirmative defense of qualified immunity.  "The doctrine of

qualified immunity protects government officials 'from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir.

2009) (quoted sources omitted).  When a defendant invokes qualified immunity, the burden

shifts to the plaintiff to establish that the defense is inapplicable.  *Id*. (citation omitted).  A

plaintiff's burden is two-pronged.  *Id*.  First, he must demonstrate that the defendant violated a

constitutional right under current law.  *Id*.  "Second, he must claim that the defendant's actions

were objectively unreasonable in light of the law that was clearly established at the time of the

actions complained of."  *Id*. (quoted source and internal quotation marks omitted).  The courts

are "permitted to exercise their sound discretion in deciding which of the two prongs of the

---

[5] The preceding analysis is not applicable if the deprivation of property results from
"established state procedure, rather than random and unauthorized action."  *See Logan v.
Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982).  Plaintiff does not challenge any
established procedure involving the handling of inmate property.

qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Here, having determined that the individual Defendants did not violate Plaintiff's constitutional rights, analysis of Defendants' qualified immunity defense is unnecessary.

<u>**Conclusion**</u>

For the above-stated reasons, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment and Partial Summary Judgment, [doc. # 78], be **GRANTED**, that Plaintiff's Complaint, [doc. #s 1, 14, 15], against Defendant Coleman be **DISMISSED with prejudice in its entirety**, and that Plaintiff's claims against Major Tubbs for failure to provide medical care and for loss of property be **DISMISSED with prejudice**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, Monroe, Louisiana, this 21st  day of April, 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

20